IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 12-147 |
| | ) | |
| SEAN MOFFITT, | ) | Judge Cathy Bissoon |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

Pending before the court is Petitioner Sean Moffitt ("Moffitt" or "Petitioner")'s Motion to Vacate Conviction and Sentence Under 28 U.S.C. § 2255 (**Doc. 246**) and Motion Requesting Certain Ministerial Records. (**Doc. 221**). For the reasons discussed herein, the Court will deny both Petitioner's § 2255 motion (**Doc. 246**) and his Motion Requesting Certain Ministerial Records (**Doc. 221**).

I. MEMORANDUM

A. Background

The Court writes exclusively for the parties and therefore sets forth only those facts that are necessary to its disposition.

This case involved a sting operation wherein an undercover federal agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), Agent Bruce Stukey, proposed to Petitioner and two other individuals – Chad Revis and Edward Harris – that they participate in a home invasion robbery on May 9, 2012 in order to steal cocaine from other drug dealers. On June 5, 2012, Moffitt, Harris, and another co-conspirator, Donald Goodwine, were charged with conspiring to possess with intent to distribute five kilograms or more of cocaine and attempting to possess with intent to distribute five kilograms or more of cocaine. Petitioner's co-defendants

1

pled guilty to both counts. Petitioner, however, chose not to plead guilty and proceeded to a trial on June 17, 2013, where he was represented by defense counsel James Kraus.[1]

At trial, Agent Stukey testified as follows:

- Agent Stukey first met Chad Revis while working undercover in April 2012. At that time, Agent Stukey told Revis that his name was Jake, and that he worked as a courier for a cocaine trafficking organization. Agent Stukey told Revis that he was dissatisfied with his role in the cocaine operation, and that he planned to rob the organization's cocaine stash house where approximately 12 to 18 kilograms of cocaine was being stored. Revis agreed to assist Agent Stukey with the planned robbery. Agent Stukey then asked Revis to introduce him to the other individuals who would be involved in the robbery. (Tr. June 18 (Doc. 209), at pp. 78-81).

- On May 2, 2012, Revis introduced Agent Stukey to Moffitt and Harris. At that meeting, Agent Stukey shared his plans to rob the stash house with Moffitt and Harris. Moffitt and Harris expressed their interest in participating in the robbery. (Doc. 209, at pp. 81-86).

- Shortly after their first meeting on May 2, 2012, Harris called Agent Stukey and told him that he and Moffitt wanted to meet with Agent Stukey again, this time without Revis. Agent Stukey returned to meet with Moffitt and Harris. During a meeting in Agent Stukey's car, which was both audio and video recorded, Harris told Agent Stukey that they wanted to commit the robbery without Revis. Harris told Agent Stukey "We're the guns. I'm the blanking man. This [referring to Moffitt] is my right-hand man." Moffitt, who was sitting in the back seat of the car, stated, in reference to Revis, "He's not the boss over us. We're the boss over him." Moffitt also stated "we really want to do this thing." A few minutes later, Harris stated "this is what we do," and that "we done pulled off licks, we got motherfuckers for 20 bricks before." Moffitt agreed, stating "this is why he [Revis] called us," and that it was "gonna to get ugly." (Doc. 209, at pp. 86-92; Trial Exhibit 8).

- On May 3, 2012, Moffitt, Harris, Agent Stukey, and another individual who went by the name "Tone," met at a restaurant. During that meeting, which was also audio and video recorded, Moffitt asked questions about the location of the stash house and also stated that they would come with "weapons of mass destruction" to help carry out the robbery. Harris also told Agent Stukey, "See we do this. This is what we do. And we got good connections." (Doc. 209, at pp. 92-102; Trial Exhibit 9).

- Five days later, on May 8, 2012, Agent Stukey called Harris and told him that the robbery would take place the next day. At 6:00 a.m. the next morning, Harris called Agent Stukey to confirm that the robbery would take place that day. At

---

[1] This case was assigned to Senior District Judge Maurice B. Cohill, Jr., who assumed inactive status on August 1, 2016. On August 11, 2016, the case was reassigned to the undersigned.

2

- 9:00 a.m., Agent Stukey told Harris to meet him at the Knight's Inn in Bridgeville, Pennsylvania. At 10:00 a.m., Harris arrived at the Knight's Inn with Donald Goodwine. Thereafter, Harris rode with Agent Stukey to pick up the van that he believed would be used in the robbery. During a recorded discussion in the car, Harris informed Agent Stukey, "I think it's going to go fine." Agent Stukey asked if "the rest of the crew was the two dudes who ate with us," meaning the two individuals who met with him at the restaurant on May 3rd, one of whom was Moffitt. Harris replied, "Yep." After arriving at the storage facility in Bridgeville where the van was located, Harris and Goodwine were arrested. (Doc. 209, at pp. 103-112; Trial Exhibit 10).

- After Harris and Goodwine were arrested, Moffitt called Agent Stukey several times. During their telephone conversation, Agent Stukey asked to meet with Moffitt. Moffitt responded that he did not want to ride around with "all of the artillery." A short time later, Moffitt called Agent Stukey and, during their conversation, which was audio recorded, Moffitt stated that he was a short distance away and would come to the stash house once he knew the address. Agent Stukey and Moffitt spoke two more times over the phone that day, during which Agent Stukey told Moffitt that he still did not have the address for the stash house. Agent Stukey then called off the operation. Moffitt called Agent Stukey several more times throughout the rest of the afternoon and into the early evening but Agent Stukey did not answer his phone. (Doc. 209, at pp. 112-119; Trial Exhibit 11).

In addition to Agent Stukey, the government called one of Harris's former colleagues, Thomas Dailey, to testify for the prosecution. Mr. Dailey testified that he was present when Harris made a telephone call to someone he called "Cowboy" on May 8, 2012 to inform him that the robbery would take place the next day. (Tr. June 19 (Doc. 210), at pp. 2-16). Other evidence presented at trial showed that Moffitt sometimes went by the nickname "Cowboy." (Doc. 212, at pp. 33, 67).

The government also called two witnesses, Sprint Supervisor Marilyn Dilley and ATF Special Agent Ryan Rennig, to testify about Moffitt's cell phone records. (Doc. 209, at pp. 64-74; Doc. 210, at pp. 17-73). Ms. Dilley and Agent Rennig testified that Moffitt's cell phone number had contact with several cell phone towers throughout the day of the planned robbery on May 9, 2012. Ms. Dilley testified that, based on her experience working at Sprint, she

understands that one's cell phone usually connects with the closest cell phone tower. (Doc. 209, at p. 70). Agent Rennig testified that Moffitt's cell phone records showed that he was in Bridgeville, approaching or nearby the area where the robbery was to take place on the morning of May 9, 2012. (Doc. 210, at pp. 25- 42). Mr. Kraus, Moffitt's trial counsel, objected to Agent Rennig's testimony, stating "[i]t appears . . . that [the government] is proposing this witness as an expert witness, and I haven't been provided with any notice of his qualifications as an expert witness." (Doc. 210, at p. 21). Furthermore, defense counsel cross-examined both Ms. Dilley and Agent Rennig regarding their lack of expertise in interpreting cell site location data. (See Doc. 209, at p. 72 (questioning Ms. Dilley as follows: "Q: Are you trained in cellular communications and the dynamics of how the phones communicate with specific towers? A. Not technically."); see also Doc. 210, at p. 46 (questioning Agent Rennig as follows: "Q. You have not received training on cellular technology, correct? A. I have not. Q. And you have not received training on tower operation or cellular antenna operation? A. No, sir, I have not either."). In addition, defense counsel questioned both Ms. Dilley and Agent Rennig regarding other factors apart from proximity that may impact a cell phone's contact with a certain cell tower. (See Doc. 209, at p. 72; Doc. 210, at pp. 47-59).

Petitioner admitted during trial that he was in the Carnegie/Bridgeville area, at his cousin Lamar Washington's house, on the morning of May 9, 2012. (See Doc. 212, at pp. 70, 75).

Petitioner was convicted by a jury of both counts. (Doc. 153). He received a life sentence for each count. (Doc. 203). Petitioner timely appealed to the Court of Appeals for the Third Circuit, asserting that the district court violated Federal Rule of Evidence 404(b) by admitting evidence of his two prior convictions. The Third Circuit affirmed Defendant's conviction and sentence on February 3, 2015. United States v. Moffitt, 601 F. App'x 152, 154

(3d Cir. 2015). Thereafter, Petitioner timely filed the instant motion to vacate.

B. Standard of Review

A prisoner in federal custody may move the sentencing court to vacate, set aside, or correct a sentence on grounds that it was:

> imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack.

28 U.S.C. § 2255(a); Hill v. United States, 368 U.S. 424, 426–27 (1962). As a remedy, the court must "vacate and set the judgment aside and . . . discharge the prisoner or resentence him [or her] or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b).

"As a collateral challenge, a motion pursuant to [§ 2255] is reviewed much less favorably than a direct appeal of the sentence." United States v. Travillion, 759 F.3d 281, 288 (3d Cir. 2014) (citing United States v. Frady, 456 U.S. 152, 167–68 (1982)). "Indeed, relief under § 2255 is available only when 'the claimed error of law was a fundamental defect [that] inherently results in a complete miscarriage of justice, and . . . present[s] exceptional circumstances where the need for the remedy afforded by the writ . . . is apparent.'" Id. (quoting Davis v. United States, 417 U.S. 333, 346 (1974) (internal quotation marks omitted)).

When a motion is made under 28 U.S.C. § 2255, the question of whether to order a hearing is committed to the sound discretion of the district court. In exercising that discretion, the Court must accept the truth of Petitioner's allegations unless they are clearly frivolous on the basis of the existing record. See United States v. Day, 969 F.2d 39, 41-42 (3d Cir. 1992). Further, the Court must order an evidentiary hearing to determine the facts unless the motion, files, and records of the case show conclusively that the Petitioner is not entitled to relief. See

id.; Gordon, 979 F. Supp. at 339.

The Court finds no need for an evidentiary hearing here, as the record conclusively establishes that Petitioner is not entitled to the relief sought in the petition. See 28 U.S.C. § 2255. Accordingly, the Court will deny his motion for an evidentiary hearing.

C. Analysis

In his § 2255 petition, Petitioner argues that his conviction and sentence resulted from his receiving ineffective assistance of counsel in violation of the Sixth Amendment of the U.S. Constitution. To support a claim that "counsel's assistance was so defective as to require reversal of conviction," a petitioner must make two showings. Strickland v. Washington, 466 U.S. 668, 687, (1984). "[A] habeas petitioner claiming a deprivation of his or her Sixth Amendment right to effective assistance of counsel must show that: (1) counsel's performance was deficient; and (2) counsel's deficient performance caused the petitioner prejudice." Ross v. Dist. Att'y of the Cnty. of Allegh., 672 F.3d 198, 210 (3d Cir. 2012) (citing Strickland, 466 U.S. at 687). As both of these components must be demonstrated to support a claim of ineffective assistance of counsel, the absence of one negates the need to address the other. Id.

"To show deficient performance, 'a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness. . . . The challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" Ross, 672 F.3d at 210. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690. "Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected . . . if they are based on professional judgment."

6

Strickland, 466 U.S. at 681. "The Supreme Court directs that our 'scrutiny of counsel's performance must be highly deferential' to avoid holding counsel incompetent because of reasonable strategic or tactical judgments which, with the benefit of tactical hindsight, might prove not to have best served his client's interests." United States v. Loughery, 908 F.2d 1014, 1018 (D.C. Cir. 1990) (quoting Strickland, 466 U.S. at 689).

Under the prejudice prong, the defendant must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . ." Rainey v. Varner, 603 F.3d 189, 197-98 (3d Cir. 2010) (quoting Strickland, 466 U.S. at 694). The question, viewed in light of all the evidence, is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Ross v. Varano, 712 F.3d 784, 797-98 (3d Cir. 2013) (quoting Strickland, 466 U.S. at 686)). "In other words, petitioner must show that there is a reasonable probability that his counsel's errors resulted in his conviction. See Glover v. United States, 531 U.S. 198, 203 (2001).

In his motion, Petitioner asserts that his counsel was ineffective based upon the following eight allegations: (1) counsel's failure to raise a sentencing entrapment defense at trial and to request a sentencing entrapment jury instruction; (2) counsel's failure to argue that the indictment should be dismissed based on "outrageous government conduct"; (3) counsel's advice that he could raise a traditional entrapment defense at trial; (4) counsel's failure to call an expert witness to rebut the testimony presented by the government's "cell-site tracking" witnesses; (5) counsel's failure to call Eric Bush to testify as to Petitioner's whereabouts on the morning of May 9, 2012; (6) counsel's failure to suppress the cell site location records for his cell phone that were obtained from Sprint; (7) counsel's failure to object to the admission of the cell site location

7

records when they were offered during trial; and (8) counsel's failure to move for a new trial or argue on direct appeal that there was a constructive amendment or prejudicial variance from the indictment. The Court will consider each of these allegations in turn.

1. Ground 1: Sentencing Entrapment Claim

First, Petitioner claims his attorney provided ineffective assistance by not raising a sentencing entrapment defense at trial and for not seeking a sentencing entrapment jury instruction. According to Petitioner, he was entrapped into committing a more serious/higher quantity cocaine trafficking crime than he otherwise was capable of committing and this, in turn, resulted in a higher statutory minimum sentence.

The Court finds that counsel was not ineffective for failing to raise a sentencing entrapment defense in this case. As the government argues, the Court of Appeals for the Third Circuit has not recognized the sentencing entrapment defense. See United States v. Drummond, 482 Fed. App'x 686, 693 (3d Cir. 2012) (noting that defendant's "theory of 'sentencing entrapment,' . . . has yet to be formally recognized in this Circuit."); United States v. Tykarsky, 446 F.3d 458, 477 n.13 (3d Cir. 2006); United States v. Raven, 39 F.3d 428, 438 (3d Cir. 1994). Trial counsel cannot be faulted for not making an argument that is not supported by Third Circuit precedent. See United States v. Mason, 774 F.3d 824, 830 (4th Cir. 2014), cert. denied, 136 S. Ct. 514 (2015) ("[W]e do not penalize attorneys for failing to bring novel or long-shot contentions.").

Furthermore, even if counsel's failure to raise the sentencing entrapment defense were somehow deficient, Petitioner cannot show that he suffered prejudice from the absence of such a defense at trial. Contrary to Petitioner's claims, the evidence presented at trial was sufficient to demonstrate Petitioner's capability to commit a robbery involving a large amount of drugs. For

example, as Petitioner and his co-conspirator, Edward Harris, informed Agent Stukey in a recorded statement, "We done pulled off licks, we got motherfuckers for 20 bricks before." (Trial Ex. 8). They also told Agent Stukey, in explaining their ability to pull off drug robberies and distribute large quantities of drugs, "See we do this. This is what we do. And we got good connections." (Trial Ex. 9). Thus, Petitioner cannot meet his burden of showing that counsel's failure to raise the sentencing entrapment defense was prejudicial, and the Court will not grant his motion to vacate on this first ground.

    2.  <u>Ground 2: Outrageous Government Conduct Claim</u>

Next, Petitioner argues that his trial counsel was ineffective for failing to argue that the indictment should be dismissed based upon "outrageous government conduct."

In the Third Circuit, "a criminal defendant may raise a due process challenge to an indictment against [him] based on a claim that the government employed outrageous law enforcement investigative techniques." <u>United States v. Nolan–Cooper</u>, 155 F.3d 221, 229 (3d Cir. 1998); <u>United States v. Barbosa</u>, 271 F.3d 438, 469 (3d Cir. 2001). This defense "is to be invoked only in the face of 'the most intolerable government conduct.'" <u>United States v. Lakhani</u>, 480 F.3d 171, 180–81 (3d Cir. 2007) (quoting <u>United States v. Jannotti</u>, 673 F.2d 578, 608 (3d Cir.1982)). The Third Circuit has continually "exercised extreme caution in finding due process violations in undercover settings," <u>United States v. Gambino</u>, 788 F.2d 938, 945 n. 6 (3d Cir. 1986), and specifically has cautioned against "exercis[ing] a 'veto'—especially, as in this case, a constitutional veto—'over law enforcement practices of which it (does) not approve.'" <u>Jannotti</u>, 673 F.2d at 610 n. 17 (quoting <u>United States v. Russell</u>, 411 U.S. 423, 435 (1973)). In light of this caution, the Third Circuit has only recognized one instance—<u>United States v. Twigg</u>, 588 F.2d 373 (3d Cir.1978)—where the conduct of law enforcement surpassed the threshold of

outrageousness necessary to invalidate a conviction. Since then, the Third Circuit has not found another factual scenario in which due process was violated by the sheer outrageousness of the government's actions. Indeed, the Third Circuit has expressed doubts as to Twigg's continuing validity. In Jannotti, where the Court of Appeals sat *en banc*, three of the judges not only distinguished Twigg, but went so far as to state that they would directly overrule it. Jannotti, 673 F.2d at 610 n. 17. Likewise, in United States v. Pitt, the court collected previous decisions within the circuit dealing with the outrageousness defense, noting that, taken together, they call Twigg into doubt. 193 F.3d 751, 761 n.11 (3d Cir.1999).

Given the above authority, the Court finds that counsel was not ineffective in failing to raise the rarely-applied, and possibly defunct, outrageousness defense in this case. Once again, the Court will "not penalize attorneys for failing to bring novel or long-shot contentions." Mason, 774 F.3d at 830. Furthermore, Petitioner cannot show that, to the extent the outrageousness defense is still available, it would apply here. Although Plaintiff cites to Twigg, that case is readily distinguishable. Whereas in Twigg, government actors not only concocted but also conducted the entire illicit scheme (*i.e.*, setting up a speed lab, a task the defendants lacked the knowhow to complete on their own), here, the presentation of a phony stash house scenario to Petitioner and his associates (who participated to varying degrees in planning and making preparations for the robbery) did not involve a level of overreaching that "violate[s] our sense of fundamental fairness or shock[s] the universal sense of justice." Pitt, 193 F.3d at 761–62. Indeed, the Third Circuit has held that "government officials may pose as non-existent sheiks in an elaborately concocted scheme," see Jannotti, 673 F.2d at 609, "supply a necessary ingredient for a drug operation," see Russell, 411 U.S. at 431–32, and "utilize landing strips, docking facilities, and other accoutrements of an organized smuggling operation," see United States v.

10

Ward, 793 F.2d 551, 553 (3d Cir.1986), "all in order to catch criminals" and without offending due process. United States v. Martino, 825 F.2d 754, 760 (3d Cir. 1987).

3. Ground 3: Plea Negotiation Claim

Petitioner also claims that his trial counsel was ineffective because he advised Petitioner that a traditional entrapment defense could be raised at trial, but, according to Plaintiff, that advice was incorrect. Petitioner claims that, had his counsel advised him that he did not have a legitimate entrapment defense, he would have pled guilty.

The Court applies the Stickland standard to claims of ineffective assistance of counsel during plea negotiations. Missouri v. Frye, 132 S.Ct. 1399, 1405 (2012). In doing so, the Court presumes that an attorney's advice to forgo a plea and go to trial is a sound strategic decision. See United States v. Berry, 2000 WL 1886603, at *3 (E.D. Pa. Dec. 6, 2000) ("the Court begins with the presumption that advising [defendant] to proceed to trial constituted sound trial strategy").

Here, Petitioner has failed to show that going to trial was not a sound strategic decision on the part of counsel. Petitioner argues that his counsel "did not research the law or investigate the facts before giving Petitioner advice that he would be able to raise an entrapment defense." Specifically, Moffitt argues that counsel should have told him that he could not establish the element of inducement, which requires a showing of "government solicitation of the crime plus some other government conduct that creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the government's efforts." (Doc. 246, at 15 (citing United States v. Mayfield, 771 F.3d 417, 434-35 (7th Cir. 2014) (en banc))).

As the government argues, Petitioner's claim that counsel did not sufficiently research the entrapment defense seems to be based solely on the fact that the jury ultimately rejected the

11

defense. Indeed, although Petitioner argues that his counsel was ineffective when he advised Petitioner that he could meet the element of inducement, in the same briefing, Petitioner argues that Agent Stukey engaged in "outrageous government conduct" by not only soliciting him to commit the crime but also providing the plan and materials to do so. (See Doc. 246 at 11-12 ("Here, the government instigated and originated the case from the very beginning. Petitioner was not preparing to do any kind of a robbery before the government's instigation"); see also id at 12 ("The government here was in control of the crime itself.")). In other words, Petitioner claims *both* that the government induced him to commit the relevant crime and that he could not, as a matter of law, prove the element of inducement. Petitioner cannot have it both ways.

In short, although Petitioner second-guesses counsel's advice, the decision or advice to go to trial is not judged in hindsight; if it were, every defendant convicted at trial would have a basis for § 2255 relief. Petitioner has failed to show, or even allege with specificity, how counsel's advice to proceed to trial fell outside the broad range of professional acceptability. Accordingly, the Court rejects this claim.

    4. Ground 4: Expert Witness Claim

Petitioner further asserts that his trial counsel was ineffective for failing to call an expert witness to rebut the testimony of what Petitioner refers to as the government's "cell-site tracking expert."

As an initial matter, the Court finds that the government did not solicit expert testimony from either Sprint Supervisor Marilyn Dilley or ATF Special Agent Ryan Rennig – the two prosecution witnesses who testified about Petitioner's cell phone records. Rather, it appears that these witnesses testified based on their personal knowledge rather than on any specialized knowledge. See Donlin v. Philips Lighting North America Corp., 581 F.3d 73, 81 (3d Cir. 2009)

("[A]n expert is [not] always necessary whenever the testimony is of a specialized or technical nature. When a lay witness has particularized knowledge by virtue of her experience, she may testify - even if the subject matter is specialized or technical - because the testimony is based upon the layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702."); United States v. Kale, 445 Fed. App'x 482, 485 (3d Cir. 2011) (finding that the district court did not err in admitting lay testimony of Sprint custodian of records regarding the interaction between cell phones and cell towers); United States v. Baker, 496 F. App'x 201, 204 (3d Cir. 2012) (law enforcement agent's testimony as to his use of computer mapping software to create a map of defendant's location from records of defendant's cell phone use did not qualify as "expert testimony," in light of omnipresent nature of computer mapping software in society today).

However, even if these witnesses had offered "expert" testimony, Petitioner's counsel was not ineffective in failing to call an expert to rebut their testimony. Deciding whether to call an expert is "fundamentally a strategic choice [made by an attorney] after a thorough investigation of the relevant law and facts." United States v. Caden, 2007 WL 4372819, at *4 (E.D. Pa. Dec. 12, 2007). As the United States Supreme Court has explained:

> Strickland does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense. In many instances, cross-examination will be sufficient to expose defects in an expert's presentation. When defense counsel does not have a solid case, the best strategy can be to say that there is too much to doubt about the [government's] theory for a jury to convict."
>
> Harrington v. Richter, 562 U.S. 86, 111 (2011).

Petitioner cannot show that his counsel was ineffective in failing to call a cell site location expert in this case, as the Court finds that counsel effectively impeached the government's experts through cross-examination. See Harrington, 562 U.S. at 111; Reinert v.

13

Larkins, 379 F.3d 76, 95 (3d Cir. 2004) (trial counsel need not introduce expert testimony on his client's behalf if he is able effectively to cross-examine prosecution witnesses and elicit helpful testimony); see also Hernandez v. United States, 2013 WL 5331055, at *12 (D.N.J. Sept. 23, 2013) (finding that defense counsel effectively close examined the government's witness "about cell phone networks and towers work and how the location of cell phones can be determined" and thus did not need to call a rebuttal witness to testify on this subject). Specifically, defense counsel cross-examined both Ms. Dilley and Agent Rennig regarding their lack of expertise in interpreting cell site location data. (See Tr. June 18, at 72:10-17; Tr. June 19, at 46:14-21). Counsel also questioned the witnesses regarding factors other than proximity that may impact a cell phone's contact with a certain cell tower. (See Tr. June 19, at 47-59). Petitioner cannot show that defense counsel's decision to cross-examine the government's witnesses, rather than to call an expert witness to rebut their testimony, was not a sound strategic decision.[2] Accordingly, the Court will not grant Petitioner relief based on this allegation.

     5. Ground 5: Eric Bush Claim

Petitioner further claims his trial counsel was ineffective for failing to call Eric Bush, identified as his cousin, to testify that Petitioner "was at his house on May 9, 2012 from 11:00 in the morning until 12:30 in the afternoon." (Doc. 246 at 19-20).

As the government notes, Petitioner did not testify at trial that he was with Eric Bush on the day of the planned robbery. Rather, Petitioner repeatedly testified that he was with Lamar

---

[2] Furthermore, Petitioner does not provide the name of an expert who would have challenged the reliability of the testimony offered by the government's two witnesses. Thus, Petitioner's implicit assertion that an expert retained by defense counsel would have exculpated him amounts to mere speculation. Duncan v. Morton, 256 F.3d 189, 201–02 (3d Cir. 2001) (prejudice resulting from ineffective assistance of counsel cannot be based on mere speculation as to what witnesses might have said).

14

Washington that day.[3] Indeed, the first time that Petitioner mentioned the name Eric Bush was in the instant motion to vacate. If, in fact, Eric Bush was a critical alibi witness, surely Petitioner would have mentioned him sometime during trial when he was accounting for his whereabouts on May 9, 2012. Thus, the Court cannot find, on this record, that defense counsel knew that Eric Bush was with Petitioner on the day of the planned robbery, or that he believed Bush's testimony would have been helpful to Petitioner. Accordingly, Petitioner has not shown that counsel was ineffective in failing to call Eric Bush as a witness. See, e.g., Diggs v. Owens, 833 F.2d 439, 445-46 (3d Cir. 1987) (an otherwise reasonable decision by counsel not to call certain witnesses is not ineffective simply because it differed from the defendant's wishes); accord United States v. Long, 674 F.2d 848, 855 (11th Cir.1982) (holding that counsel's failure to call alibi witnesses was not ineffective assistance and stating: "This Court will not second-guess tactical decisions of counsel in deciding whether to call certain witnesses.").

Furthermore, as the government argues, Petitioner cannot show that Eric Bush's testimony would have changed the outcome of the trial. As Petitioner admits, Eric Bush lived in the Bridgeville area, close to where Petitioner was planning to meet Agent Stukey on the day of the planned robbery. Thus, the jury may have regarded Petitioner's presence at Eric Bush's house in Bridgeville, rather than at his own home or a different location, as further incriminating (rather than exculpatory) evidence. Furthermore, it appears to the Court that Bush's testimony would have directly contradicted Petitioner's testimony that he was with his cousin Lamar

---

[3] See Doc. 212 at 70 ("Q: How did you – do you remember how you got to Carnegie? A: Yeah. I was with my cousin. Q: Okay. Who is your cousin? A. Lamar. Q: And where did Lamar live? A: He lived in Carnegie") and id. at 97 (stating that he was with his cousin Lamar Washington at his aunt's house that day); see also Doc. 213 at 18-19 ("Q: Where else were you in Bridgeville or Carnegie around the same time on May 9th, 2012? A: We drove over to a bar. . . . Q: Okay. And who were you with? A: I was with my cousin, Lamar, the same person. Q: What's Lamar's last name? A: Washington") and id. at 20 ("Q: Did you see any other relatives when you were in Bridgeville at that time? A: Seen a few friends and stuff that live right there.").

15

Washington (and not Bush) on May 9, 2012. Accordingly, Petitioner has not shown that defense counsel's decision not to call Eric Bush was prejudicial, and thus will not grant him relief on this ground.

6. Ground 6: Cell-Site Location Suppression Claim

Petitioner also claims his trial counsel was ineffective for failing to move to suppress his cell phone records, arguing that "the warrantless seizure of this information violates the Fourth Amendment." However, contrary to Petitioner's claim, the government's search of his cell phone records was done pursuant to a valid search warrant. (See June 5, 2012 Search Warrant, Doc. 251-1). Furthermore, even if the records were seized without a warrant, the Court would not have suppressed this evidence. Under Third Circuit precedent, a warrant is not required to obtain cell site location information for cell phone calls. See In re Application of U.S. for an Order Directing a Provider of Elec. Comm'n Serv. to Disclose Records to Gov't, 620 F.3d 304, 313 (3d Cir. 2010). Defense counsel's failure to make a motion that had no potential for success was neither ineffective nor prejudicial.

7. Ground 7: Cell-Site Location Admission Claim

In addition, Petitioner claims that his trial counsel was ineffective for failing to object to the admission of cell site location evidence at trial, claiming that only a qualified expert can testify on this subject. The Court disagrees.

As noted above, the Third Circuit has held that lay witnesses—including law enforcement officers and cell phone record custodians—can properly testify about a defendant's location based on his or her cell phone records. For instance, in Kale, the defendant challenged the admission of lay testimony by Sprint's custodian of records regarding how cell phone waves reach cell towers. 445 Fed. App'x at 585-86. The Third Circuit concluded that the witness's

16

testimony was based on his personal knowledge rather than specialized knowledge, observing that, "[a] person of average intelligence would almost certainly understand that the strength of one's cell phone reception depends largely on one's proximity to a cell phone tower." Id. at 485. Likewise, in Baker, the Third Circuit upheld the district court's admission of lay testimony by an FBI Agent that he had used commercially available software to create a map of the defendants' locations from records of their cell phone use. 496 F. App'x at 204; accord United States v. Feliciano, 300 F. App'x 795, 801 (11th Cir. 2008) (holding that police officer's testimony regarding locations of cell towers was based upon officer's review of cellular telephone records and did not constitute expert testimony).

Because the testimony of the government's witnesses regarding the cell site location evidence in this case was properly admitted, the Court rejects Petitioner's claim that counsel was ineffective in failing to object to the introduction of this testimony at trial.

### 8. Ground 8: Constructive Amendment or Variance of Indictment

Finally, Petitioner claims that counsel was ineffective for failing to argue that there was a constructive amendment or prejudicial variance between the crime charged in the indictment and the evidence adduced at trial. Specifically, Petitioner claims that, while he was charged with conspiracy to distribute cocaine, the evidence at trial showed that he conspired to commit a Hobbs Act robbery under 18 U.S.C. § 1951.

An indictment is constructively amended when, in the absence of a formal amendment, the evidence and jury instructions at trial modify essential terms of the charged offense in such a way that there is a substantial likelihood that the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged. United States v. Daraio, 445 F.3d 253, 259–60 (3d Cir. 2006). A variance occurs when "the

charging terms are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." United States v. Castro, 776 F.2d 1118, 1121 (3d Cir.1985). Unlike a constructive amendment, a variance can result in a reversible error only if it is likely to have surprised or otherwise has prejudiced the defense. United States v. Schurr, 775 F.2d 549, 553–54 (3d Cir.1985). To demonstrate prejudice from a variance, a defendant "must show (1) that there was a variance between the indictment and the proof adduced at trial and (2) that the variance prejudiced some substantial right." United States v. Balter, 91 F.3d 427, 441 (3d Cir.1996). "A variance does not prejudice a defendant's substantial rights (1) if the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or surprised at trial, [or] (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense." United States v. Schoenhut, 576 F.2d 1010, 1021–22 (3d Cir.1978).

In this case, the Court finds no constructive amendment or variance between the indictment and the evidence at trial. To the contrary, the evidence at trial plainly showed that Petitioner was part of a conspiracy to possess with intent to distribute 5 kilograms or more of cocaine. Specifically, the government presented evidence at trial that Petitioner and his co-conspirators reached an agreement to rob a stash house where they believed approximately 12 to 18 kilograms of cocaine was being stored. The quantity of cocaine that the co-conspirators believed they would steal was far in excess of the 5 kilograms charged in the indictment and was so great a quantity that it is reasonable to infer that they were purchasing it for distribution rather than for personal use. See United States v. Rodriguez, 961 F.2d 1089, 1092 (3d Cir. 1992) ("When a defendant is found in possession of a sufficiently large quantity of drugs, an intent to distribute may logically be inferred from the quantity of drugs alone."). Thus, the Court finds

that the evidence presented at trial provided direct proof that Petitioner committed the charged offense. Furthermore, even assuming there was a variance here, Petitioner cannot show prejudice. At the time of the indictment, Petitioner was well aware of the facts resulting in his criminal charge, *i.e.*, his communications and actions related to the sting operation that took place between May 2 and May 9, 2012. Thus, Petitioner cannot argue that he was deprived of the opportunity to effectively prepare his defense in this case. Nor can Petitioner show any risk of being prosecuted a second time for the same offense.

Because there was no constructive amendment and/or prejudicial variance in this case, Petitioner cannot show that counsel was ineffective for failing to raise this argument at trial and on appeal. Thus, the Court rejects Petitioner's final basis for relief.

D. Certificate of Appealability

A court should issue a certificate of appealability where a petitioner makes a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). A petitioner meets this burden by showing that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. Slack v. McDaniel, 529 U.S. 473, 484, 120 S.Ct. 1595 (2000). The Court finds that reasonable jurists would not find it debatable that Petitioner does not present any claims upon which habeas relief may be granted. Therefore, the Court will deny a certificate of appealability.

E. Motion Requesting Certain Ministerial Record

On September 22, 2014, Petitioner filed a motion titled, "Motion Requesting Certain Ministerial Record in Support of Plaintiff Indictment Against Sean Moffitt." (Doc. 221). Through that Motion, Petitioner sought records related to his grand jury indictment, including: "the date the grand jury heard the case against Sean Moffitt;" "the date on which the case was

submitted to the grand jury;" "the date the indictment was returned in open court by the grand jury;" "the name of the judge to whom the indictment was returned;" "the name of the United States or assistant United States attorney to whom [sic] presented the case to the grand jury;" "the charges presented to the grand jury;" and "whether the alleged indictment was a superceding [sic] indictment or original indictment." Petitioner indicated that he needed these records to prepare for his appeal before the Court of Appeals for the Third Circuit. However, the Court finds no reasonable basis why such information would be useful in either an appeal or a request for relief under 28 U.S.C. § 2255. Furthermore, given that the Third Circuit has already dismissed Petitioner's appeal, his request for documents in support of that appeal is now moot. For these reasons, Plaintiff's Motion Requesting Certain Ministerial Documents (Doc. 221) will be DENIED.

## II. ORDER

Based upon the foregoing, Petitioner has not shown that a manifest injustice will result if the Court does not vacate his conviction and sentence. Accordingly, Petitioner's Motion to Vacate Conviction and Sentence under 28 U.S.C. § 2255 (**Doc. 246**) is DENIED. Furthermore, Petitioner's Motion Requesting Certain Ministerial Documents (**Doc. 221**) is DENIED. A certificate of appealability will not issue.

December 15, 2016	s/Cathy Bissoon
	Cathy Bissoon
	United States District Judge

cc (via ECF email notification):

All Counsel of Record